**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ILLINOIS**

| | |
|---|---|
| HANGXIAO CHE, an individual; DENGXING CHEN, an individual; JIANGUANG CHU, an individual; WAN YUN FENG, an individual; GUOSHEN GAO, an individual; XING GAO, an individual; ZUFANG HE, an individual; BINGDONG JIANG, an individual; WANXIA JIN, an individual; JIAQI LIU, an individual; CHENDUO QI, an individual and husband of Decedent Xiuyun Chen; WENHAO QI, an individual and son of Decedent Xiuyun Chen; SHOUQI SHEN, an individual; YOUXIN SONG, an individual; BINGMEI XIE, an individual; DONG MEI XU, an individual; QIAN XU, an individual; QIN XU, an individual; ZUMIAN WANG, an individual; GUIFANG ZHOU, an individual; <br><br>      Plaintiffs, <br><br>    v. <br><br> DAIMLER TRUCKS NORTH AMERICA, LLC, a Delaware limited liability company, DAIMLER TRUCKS & BUSES US HOLDING, LLC, a Delaware limited liability company; DAIMLER AG, a German corporation; TRUCK CENTERS, INC., an Illinois corporation; SVO GROUP, INC., an Indiana corporation; TERRANCE MINIX, an individual; EMBASSY SPECIALTY VEHICLES, LLC., an Indiana limited liability company; and DOES 1 through 50, inclusive; <br><br>      Defendants. | Civil Action No. 3:21-cv-180 <br><br><br> **COMPLAINT AT LAW** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiffs Hangxiao Che, Dengxing Chen, Jianguang Chu, Wan Yun Feng, Guoshen Gao, Xing Gao, Zufang He, Bingdong Jiang, Wanxia Jin, Jiaqi Liu, Chenduo Qi, Wenhao Qi, Shouqi Shen, Youxin Song, Zumian Wang, Bingmei Xie, Dong Mei Xu, Qian Xu, Qin Xu, and Guifang Zhou, hereby allege as follows:

## NATURE OF THE CASE

1.     This action arises out of the personal injuries suffered by Plaintiffs Hangxiao Che, Dengxing Chen, Jianguang Chu, Wan Yun Feng, Guoshen Gao, Xing Gao, Zufang He, Bingdong Jiang, Wanxia Jin, Jiaqi Liu, Chenduo Qi, Wenhao Qi, Shouqi Shen, Youxin Song, Zumian Song, Bingmei Xie, Dong Mei Xu, Qian Xu, Qin Xu, Xumian Wang, and Guifang Zhou resulting from the single vehicle on-road rollover accident of a model year 2017 Embassy bus in southern Utah. The vehicle involved in the accident was designed, manufactured, and distributed by Defendants Daimler Trucks North America, LLC; Daimler Trucks & Buses US Holding, LLC; Daimler AG, Truck Centers, Inc.; SVO Group, Inc.; Terrance Minix; and Embassy Specialty Vehicles, LLC, as successor in interest to SVO Group, Inc.; and all such unknown Defendants as whom may become known through investigation and discovery in this action.

2.     Plaintiffs Chenduo Qi and Wenhao Qi are wrongful death heirs of Xiuyun Chen, who died from her injuries in the bus accident.

## INTRODUCTION

3.     In September 2019, a group of 29 Chinese citizens, including Plaintiffs in this action, and one tour leader traveled from the People's Republic of China to Los Angeles, California, to participate in a tour of various national parks located throughout the western United States.

4.     On Saturday, September 16, 2019, the group began the tour on a 36-passenger Embassy bus designed and manufactured by Defendant SVO Group, Inc., incorporating a Freightliner M2 106 chassis, designed and manufactured by Defendant Daimler Trucks North America. The Embassy bus was owned and operated by American Shengjia, Inc., and was driven by an individual named Yu Ren.

5.     The group toured Hollywood, California on September 15; San Diego, California on September 16; Las Vegas, Nevada on September 17; the South Rim of the Grand Canyon, Arizona on

September 18; and Zion National Park, Utah on September 19.

6.      On September 20, 2019, at approximately 11:30 a.m., Plaintiffs as part of the tour group were traveling on the bus on eastbound Utah State Route 12 (SR-12), a two-laned asphalt paved and striped roadway, near Bryce Canyon City, in Garfield County, Utah. The bus was traveling at approximately the posted 65 mph speed limit when its right-side tires went off the paved roadway while negotiating a slight curve to the right.  The driver attempted to steer the bus back onto the roadway, but in so doing the bus began to cross into the westbound travel lane.  The driver then steered the bus back to the right resulting in the bus entering into a clockwise yaw.  While all the bus' wheels were still on the paved roadway, the bus rolled onto the driver's side and started sliding on the paved roadway, roof first.  When the roof structure contacted the guardrail on the left side of the roadway, the vehicle rolled anther 270 degrees and came to rest on its wheels.



7.      In the incident, the vehicle's roof structure suffered catastrophic deformation, opening

large ejection portals in the bus' passenger compartment, resulting in the complete ejections of 11 passengers and the partial ejection of two others.



8.      As a result of this horrific incident, four passengers were killed, 15 were seriously injured, and the driver and 11 additional passengers suffered at least minor injuries.

**JURISDICTION AND VENUE**

9.      This Court has subject matter jurisdiction pursuant to 28 U.S.C § 1332, as the amount in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and Plaintiffs are not from the same state as any of the Defendants.

10.     This Court has general and specific personal jurisdiction over Defendants Daimler Trucks North America, LLC; Daimler Trucks & Buses US Holding, LLC; Daimler AG; Truck Centers, Inc., SVO Group, Inc.; Terrance Minix; and Embassy Specialty Vehicles, LLC, as successor in interest to SVO Group, Inc. because Defendants Daimler Trucks North America, LLC, Daimler Trucks & Buses

US Holding, LLC, and Daimler AG sold the Freightliner M2 106 cutaway chassis and cab to Truck Centers, Inc., located at 2280 Formosa Road, Troy, Madison County, Illinois, which, in turn, sold the Freightliner M2 106 cutaway chassis and cab to Defendants SVO Group, Inc., Terrance Minix, and Embassy Specialty Vehicles, LLC, as successor in interest to SVO Group, Inc. Therefore, all Defendants 1) committed some or the tortious acts that are the basis of this action within the Southern District of Illinois; 2) engaged in foreseeable, intentional, and/or systemic contacts within Illinois; 3) purposefully availed themselves of the privileges and benefits of conducting business in the Southern District of Illinois; and 4) sold and placed into the stream of commerce the defective product directly within the Southern District of Illinois.

11.     The Southern District of Illinois is a proper venue for this matter as some or all of the transactions or occurrences related to this action occurred within this District.

12.     Venue is proper in the Southern District of Illinois, pursuant to 28 U.S.C. 1391(a) and (b), because a substantial part of the events, acts, and omissions giving rise to these claims occurred in the District.

**PARTIES**

**A.     PLAINTIFFS**

13.     Plaintiff Hangxiao Che is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Hangxiao Che was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Hangxiao Che was 63 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

14.     Plaintiff Dengxing Chen is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Dengxing Chen was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Dengxing Chen was 60 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.

15.     Plaintiff Jianguang Chu is a citizen of the People's Republic of China, who was at all

relevant times herein residing in the People's Republic of China.  Plaintiff Jianguang Chu was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Jianguang Chu was 67 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.

16.     Plaintiff Wan Yun Feng is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Wan Yun Feng was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Wan Yun Feng was 56 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

17.     Plaintiff Guoshen Gao is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Guoshen Gao was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Guoshen Gao was 60 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.  At the time of the rollover crash alleged herein, Plaintiff Guoshen Gao was seated next to his wife, Plaintiff Xing Gao, who was also seriously injured in the incident.

18.     Plaintiff Xing Gao is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Xing Gao was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Xing Gao was 73 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable. At the time of the rollover crash alleged herein, Plaintiff Xing Gao was seated next to her husband, Plaintiff Guoshen Gao, who was also seriously injured in the incident.

19.     Plaintiff Zufang He is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Zufang He was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Zufang He was 60 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

20.     Plaintiff Bingdong Jiang is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Bingdong Jiang was a

passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Bingdong Jiang was 61 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.

21.     Plaintiff Wanxia Jin is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Wanxia Jin was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Wanxia Jin was 56 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable. At the time of the rollover crash alleged herein, Plaintiff Wanxia Jin was seated next to her husband, Plaintiff Shouqi Shen, who was also seriously injured in the incident.

22.     Plaintiff Jiaqi Liu is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Jiaqi Liu was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Jiaqi Liu was 60 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

23.     Plaintiff Chenduo Qi is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Chenduo Qi was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Chenduo Qi was 68 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable. Plaintiff Chenduo Qi was the husband of passenger Xiuyun Chen, age 67, who died as a result of the injuries she received in the rollover crush. Plaintiff Chenduo Qi also suffered and continues to suffer the loss of love, companionship, comfort, affection, solace, and moral support of Xiuyun Chen, for which Defendants are liable.

24.     Plaintiff Wenhao Qi is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Wenhao Qi was the son of passenger Xiuyun Chen, age 67, who died as a result of the injuries she received in the rollover crush. Plaintiff Wenhao Qi suffered and continues to suffer the loss of love, companionship, comfort, affection, solace, and moral support of Xiuyun Chen, for which Defendants are liable.

25.     Plaintiff Shouqi Shen is a citizen of the People's Republic of China, who was at all

relevant times herein residing in the People's Republic of China. Plaintiff Shouqi Shen was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Shouqi Shen was 65 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable. At the time of the rollover crash alleged herein, Plaintiff Shouqi Shen was seated next to his wife, Plaintiff Wanxia Jin, who was also seriously injured in the incident.

26.     Plaintiff Youxin Song is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Youxin Song was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Youxin Song was 67 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

27.     Plaintiff Zumian Wang is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Zumian Wang was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Zumian Wang was 67 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.

28.     Plaintiff Bingmei Xie is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Bingmei Xie was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Bingmei Xie was 57 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

29.     Plaintiff Dong Mei Xu is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Dong Mei Xu was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Dong Mei Xu was 61 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

30.     Plaintiff Qian Xu is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China. Plaintiff Qian Xu was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Qian Xu was 32 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable. At the time

of the rollover crash alleged herein, Plaintiff Qian Xu was seated next to her mother, Plaintiff Qin Xu, who was also seriously injured in the incident.

31.     Plaintiff Qin Xu is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Qin Xu was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Qin Xu was 60 years old at the time he sustained the injuries and damages set forth herein for which Defendants are liable.

32.     Plaintiff Guifang Zhou is a citizen of the People's Republic of China, who was at all relevant times herein residing in the People's Republic of China.  Plaintiff Guifang Zhou was a passenger on the Embassy bus at the time of the rollover crash alleged herein. Plaintiff Guifang Zhou was 60 years old at the time she sustained the injuries and damages set forth herein for which Defendants are liable.

**B.     DEFENDANTS**

33.     Defendant Daimler Trucks North America, LLC, is a Delaware limited liability company with its principal place of business located at 4555 N. Channel Avenue, Portland, Oregon. Defendant Daimler Trucks North America's does business in all 50 states and the District of Columbia.

34.     According to its corporate website: "Founded in 1942 as Freightliner Corporation, Daimler Trucks North America is the leading heavy-duty truck manufacturer in North America. The company produces and markets commercial vehicles under the Freightliner, Western Star, and Thomas Built Buses nameplates. In addition, its family of brands includes Detroit, Alliance, Freightliner Custom Chassis Corporation, and SelecTrucks."

35.     Defendant Daimler Trucks & Buses US Holding, LLC, is a Delaware limited liability company with its headquarters located in Oregon. Based on information and belief, Defendant Daimler Trucks & Buses US Holding, LLC, is the sole member of Daimler Trucks North America, LLC.

36.     Defendant Daimler AG, is a corporation organized and existing under the laws of the Federal Republic of Germany, with its principal place of business located in Stuttgart, State of Baden-Württemberg, in the Federal Republic of Germany.

37.     From this point forward, Defendants Daimler Trucks North America, LLC, Daimler

Trucks & Buses US Holding, LLC, and Daimler AG may be collectively referred to herein as the "Daimler Defendants" or "First Stage Manufacturer."

38.     Defendant Truck Centers, Inc., is an Illinois corporation with its headquarters located at 2280 Formosa Road, Troy, Illinois.  Defendant Truck Centers, Inc. operates ten full-service dealerships and two satellite locations in the St. Louis metropolitan area, Illinois, and Indiana, representing Freightliner brand vehicles.

39.     Defendant SVO Group, Inc., was, at the time of the subject incident, an Indiana corporation with its principal place of business located at 2503 Ada Drive, Elkhart, Indiana.  Defendant SVO Group, Inc. was purported to be dissolved on April 17, 2020.  Defendant SVO Group, Inc., registered the name "Embassy" for its buses, specialty vehicles, and recreational vehicles. Based on information and belief, Plaintiffs allege that this purported dissolution was executed for the purpose of avoiding known potential judgment creditors arising out of the subject incident.

40.     Defendant Embassy Specialty Vehicles, LLC, is an Indiana limited liability company with its principal place of business located at 2933 Thorne Drive, Elkart, Indiana. Based on information and belief, Defendant Embassy Specialty Vehicles, LLC, was formed on November 5, 2019, after acquiring the assets of SVO Group, Inc., and transacted business under the assumed name of SVO, and is for all purposes herein, the successor in interest to Defendant SVO Group, Inc.

41.     Defendant Terrance Minix, an individual, is a resident of Elkhart, Indiana.  Defendant Minix is the co-founder and owner of Defendant SVO Group, Inc., and is a co-founder and owner of Defendant Embassy Specialty Vehicles, LLC, which, at the time of its formation, acquired the assets of SVO Group, Inc.

42.     From this point forward, Defendants SVO Group, Inc., Terrance Minix, and Embassy Specialty Vehicles, LLC, may be referred to herein collectively as the "SVO Defendants" or "Second Stage Manufacturer."

43.     The true names and capacities of the Defendants sued herein as Does 1 through 50, inclusive, are currently unknown to Plaintiffs, who therefore sue such Defendants by such fictitious names. Each of the Defendants designated herein as a DOE is legally responsible in some manner for the

unlawful acts referred to herein.  Plaintiffs will seek leave of court to amend this Complaint to reflect the true names and capacities of the Defendants designated herein as DOES when such identities become true names and capacities of the Defendants designated herein as DOES when such identities become known.

44.     Based upon information and belief, Plaintiffs allege that at all times mentioned herein, each and every Defendant was acting as an agent and/or employee of each of the other Defendants, and at all times mentioned was acting within the course and scope of said agency and/or employment with the full knowledge, permission, and consent of each of the other Defendants.  In addition, each of the acts and/or omissions of each Defendant alleged herein were made known to, and ratified by, each of the other Defendants.

## FACTUAL ALLEGATIONS

A.    **THE EMBASSY BUS BY SVO GROUP CUTAWAY BUS INCORPORATING THE FREIGHTLINER M2 106 CAB AND CHASSIS**

45.     The vehicle involved the single vehicle on-road rollover accident resulting in the ejections of 11 passengers, partial ejection of two passengers, death of four passengers, serious injury of 15 passengers, and injury to another 11 passengers and the driver, was one of a class of busses referenced in industry parlance as medium-sized cutaway buses—the most widely available type of bus used in public transportation today.

46.     Small-to-medium-sized cutaway buses are used widely for demand response transit and paratransit services by transit agencies in the United States, as well as by limousine and touring companies, such as American Shengjia, Inc. Cutaway vehicles in this category average roughly 25 to 35 feet in length and have a 16,000 to 26,000 pound gross vehicle weight rating (GVWR), with a seating capacity ranging from 22 to 30 passengers.

47.     When this class of vehicle was first developed in the early 1970s, one of the primary advantages of this class of vehicle was the lower center of gravity and the dual rear wheels, which provided a combination of increased seating capacity and handling stability over conventional vans and van conversions.

48.     Medium-duty cutaway vehicles utilize a front-engine cab chassis manufactured by medium-and heavy-duty truck manufacturers—known as the "First Stage" manufacturer. As produced by the first stage manufacturer, a cutaway van chassis generally features a front-end cab design. The body ends immediately behind the driver and front passenger seats and is usually covered by temporary plywood or heavy cardboard material to be shipped to a second stage manufacturer for completion.



49.     These chassis are defined in the Federal Motor Vehicle Safety Standards as "incomplete vehicles."  The Daimler Defendants' Freightliner Truck Division is one of four primary Stage One manufacturers of medium-duty cutaway cab chassis in the United States.

50.     First Stage manufacturers must provide an incomplete vehicle document (49 CFR part 568) to subsequent manufacturers listing each regulatory standard that applies.

51.     The "bodies" of small-to-medium-sized cutaway buses are customized and mounted on the frame rails of the purchased "incomplete vehicle" chassis and then integrated with the front cab section by "Second Stage" manufacturers, such as Defendant SVO Group, Inc., to build a "complete

vehicle."



52.    As of 2015, The National Transportation Safety Board estimated that approximately 11,600 mid-size buses (buses with a GVWR between 10,000 pounds and 26,000 pounds)—such as the Subject Vehicle—are produced each year.

53.    Both First Stage and Second Stage manufacturers of cutaway buses typically provide warranties covering the chassis, cab, and body components of these vehicles.

54.    The Freightliner M2 106 chassis and cab of the Embassy Bus involved in the subject incident was designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed, and sold by Defendant Daimler Trucks of North America, LLC.

55.     The Freightliner M2 106 was sold by Defendant Daimler Trucks North America, LLC, to Defendant Truck Centers, Inc., for delivery to Defendant SVO Group, Inc. on December 8, 2016.  (*See* (Exhibit 1, Vehicle Invoice.)

```
 1
                          DAIMLER TRUCKS NORTH AMERICA LLC            PAGE   1
                4747 N CHANNEL AVE, PO BOX 3849, PORTLAND, OR 97208-3849
       0VEHICLE ID: 3ALACWDT7HDJD9595              INVOICE NO..........S21592
          VEH S/N: JD9595                          INVOICE DATE......12/08/16
                                                   TSO NO............ELKDK9793
                                                   MODEL NO.............M2106
                                                   ENG SN.............74061508
                                                   BUILD LOC...AGO TIANGUISTEN
                                                   PO NO.....................
                                                   SALES OUTLET..........EIXD
                                                   CUSTOMER ACCT........W96402
                                                   STOCK OR SOLD.........SOLD
       0              TRUCK CENTERS, INC.          CONCESSION .........6H0079
          SOLD
          TO:        2280 FORMOSA ROAD
                     TROY, IL 62294
                                                   ****************************
                                                   * PAYMENT FOR THIS VEHICLE *
                                                   * IS DUE ON 12/22/16       *
          TO BE                                    ****************************
          PAID        DAIMLER TRUCK FINANCIAL
          BY:         1011 WARRENVILLE RD,
                      SUITE 700
                      LISLE, IL 60532


          CUSTOMER:   SVO GROUP
                      3416 CR 6 E
                      ELKHART, IN 46514
```

**B.     Daimler Defendants Offering of Stability Controls and Lane Departure Warning Systems as For-Profit Options**

56.     The importance of stability control systems to vehicle safety has been understood in the bus industry for decades.  Two types of stability control systems have been developed for large vehicles, including buses.  Roll stability control (RSC) prevents rollovers by decelerating the vehicle using braking and engine torque control.  Electronic stability control (ESC) includes all of the functions of an RSC system, but adds the ability to mitigate severe oversteer or understeer by automatically applying brake force at selected wheel-ends to help maintain the vehicle's directional control.

57.     According to a National Highway Traffic Safety Administration ("NHTSA") Notice of

Proposed Rule Making ("NPRM") published in 2012—more than four years before the subject vehicle's manufacture—NHTSA had been testing truck tractors and large buses with stability control systems and sponsoring studies of crash data since 2006 in order to examine the potential safety benefits of stability control systems. NHTSA and industry representatives separately evaluated data on dynamic test maneuvers and, at the same time, NHTSA launched a three-phase testing program to improve its understanding of how truck and bus stability control systems in large vehicles work, then develop dynamic test maneuvers to challenge roll propensity and yaw stability. By combining the studies of the crash data with the testing data, NHTSA was able to evaluate the potential effectiveness of stability control systems for truck tractors and large buses and determined that ESC systems can be 28 to 36 percent effective in reducing first-event untripped rollovers and 14 percent effective in eliminating loss-of-control crashes caused by severe oversteer or understeer conditions.  By the time NHTSA issued the Final Rule on June 23, 2016, it increased its estimate of the percentage of untripped rollover crashes that would be prevented by ESC systems to a range of between 40 and 56 percent.

58.    Similarly, the National Transportation Safety Board—the independent federal agency charged with charged by Congress with investigating significant accidents in various modes of transportation and issuing safety recommendations aimed at preventing future accidents—issued a safety recommendation that the installation of stability control systems on all newly manufactured commercial vehicles with a GVWR greater than 10,000 pounds be required.  (*See* National Transportation Safety Board Safety Recommendation No H-11-08.)

59.    Likewise, since 2012, the United Nations (UN) Economic Commission for Europe (ECE) Regulation 13, Uniform Provisions Concerning the Approval of Vehicles of Categories M, N and O with Regard to Braking, was amended to include Annex 21, Special Requirements for Vehicles Equipped with a Vehicle Stability Function, which required trucks with a GVWR greater than 3,500 kg (7,716 lb.), buses with a seating capacity of 10 or more (including the driver), and trailers with a GVWR greater than 3,500 kg (7,716 lb.) to be equipped with a stability system that includes rollover control and directional control.

60.    The Daimler Defendants were well familiar with the benefits of stability control systems

for a decade prior to their sale of the subject vehicle, and several years prior to NHTSA's proposed rule-making.  Since 2006, Freightliner engaged with Meritor-WABCO to provide ESC systems as a for-profit option on Freightliner's entire truck line. According to Freightliner senior vice-president of engineering and technology, Michael von Mayenburg, in a 2005 statement, "ESC holds significant potential to reduce accidents." In that same 2005 publication, Freightliner engineer Tom Moore explained, "Our philosophy is that when a stability system has to activate, the vehicle is in trouble. The driver has done something he shouldn't have done. He's made some kind of mistake and at that point in time, we're not going to give him a chance to make a second mistake, we're going to take control of this now."

61.    According to the Freightliner M2 manual, published in March 2016:

> ESC automatically reduces engine power, applies the engine brake, and/or applies the tractor and trailer brakes when the acceleration sensor detects that the vehicle is at risk of rolling over. In addition, ESC offers the added capability of complete directional stability (yaw control) in oversteer and understeer conditions to reduce the likelihood of drift-out or jackknife. The system determines where the driver is attempting to steer the vehicle and how much brake demand is required in order to more precisely control the vehicle in an emergency situation.
>
> ESC works by constantly comparing the driver's intention with the vehicle's actual behavior. The system does this by monitoring systems such as wheel speed, steering angle, yaw rate, lateral acceleration, throttle position, and brake application. A central microcomputer analyzes the collected data and triggers a response to keep the vehicle on course when an unstable condition is detected.
>
> The roll stability control system automatically reduces engine power, applies the engine brake, and/or applies the tractor and trailer brakes when the acceleration sensor detects that the vehicle is at risk of rolling over. The control can intervene even before an advisory message is displayed.
>
> When the system detects that the vehicle is at risk of oversteering or understeering, it applies individual tractor wheel end brakes and trailer brakes, activates the engine brake (if equipped), and/or cuts engine power, depending on the severity. As a result, the driver has full control over the vehicle until the system detects a potential risk and intervenes accordingly. ESC operates automatically; the driver does not monitor or activate the system.

(Freightliner Business Class M2 Driver's Manual, at p. 9.6-9.7.)

62.    Similarly, the Daimler Defendants began offering Meritor-WABCO's "OnLane" lane departure warning system in 2013. OnLane is a forward-looking, vision-based lane departure warning

system designed to monitor road markings and the vehicle's position in the lane. The system delivers audible warnings to the driver if the vehicle leaves its lane unintentionally, and has a driver alertness warning feature that detects erratic or degraded driving based on lane weaving.

63.     Lane departure warning systems provide a valuable safety benefit by preventing rollovers, which often occurs when a vehicle leaves the road.

64.     For years preceding the subject incident, the Federal Motor Carrier Safety Association ("FMCSA") has promoted the implementation of lane departure warning systems to trucking fleets to encourage safe driving behaviors and reduce crashes. Indeed, both governmental and industry organizations such as the National Transportation Safety Board, The United Nations European Economic Council, the insurance Institute for Highway Safety, the National Association for Pupil Transportation, Advocates for Highway Auto and Safety, Robert Bosch, LLC, and Skagit Transportation, Inc., have all recommended that enhanced stability control systems be mandatory on all buses greater than 10,000 pounds GVWR—such as the Subject Vehicle.

65.     Nevertheless, in 2016 when the Daimler Defendants sold the subject Freightliner M2 106 chassis and cab, it continued to only offer "Vehicle Stability Advisor and Control," "Lane Departure Warning Systems," "Obstacle Detection System," and Camera/Video/Imaging System" as for-profit options and, in fact, did not equip the Subject Vehicle with these crucial safety systems, notwithstanding that it had actual knowledge that its cutaway cab and chassis was being purchased by Defendant SVO Group, Inc.—a company specializing in the Second Stage manufacturing of cutaway buses.

```
456   736-998   NO OBSTACLE DETECTION SYSTEM            ■
457   73H-998   NO CAMERA/VIDEO/IMAGING SYSTEM          ■
458   49B-998   NO VEHICLE STABILITY ADVISOR OR CONTROL ■
459   73B-998   NO LANE DEPARTURE WARNING SYSTEM        ■
```

66.     Equally culpable with the Daimler Defendants for making critical safety-related enhanced stability controls and warning systems a for-profit option on the Subject Vehicle, are Defendants SVU Group, Minix, and Embassy Specialty Vehicles for failing to order these critical safety systems on a vehicle being designed specifically for transporting large passenger groups.

67.     The consequences of the collective indifference of the First Stage and Second Stage

manufacturers to equipping this vehicle with critical safety systems otherwise widely in use at the time of the vehicle's manufacture were borne by innocent passengers with no ultimate say in whether the vehicle was equipped with such systems, much less the vehicle's failure to perform without them.

68.     The accident occurred on sunny fall day on a section of roadway brightly striped both on the center-line and outer edges of the roadway.  Plaintiffs allege that if the vehicle had been equipped with the lane departure warning system, it is more likely than not that the driver would have been alerted to the fact that the Subject Vehicle was veering toward the right edge of the roadway and would have been able to prevent the vehicle from leaving the roadway in the first instance.

69.     Plaintiffs further allege that had the Subject Vehicle been equipped with the available enhanced stability control systems, the vehicle more likely than not would have been able to be controlled once back on the roadway and not entered into the extreme yaw leading to the on-road untripped rollover that caused the catastrophic deformation of the bus body, in turn opening large ejection portals in the passenger compartment of the bus, and the complete ejections of 11 passengers, the partial ejection of two more passengers, the deaths of four passengers, critical injuries to 15 passengers, and minor injuries to 11 more passengers and the driver.

**C.     SVO Group Defendants SVO Untested Approach to the Manufacture of the Bus Body**

70.     Following the delivery of the Freightliner M2 106 to Defendant SVO Group, Inc., the SVO Group Defendants manufactured and installed a bus "body" on the chassis, allegedly capable of seating 36 passengers and a driver, with single primary storage compartment for passenger luggage located at the rear of the vehicle, well behind the rear axles.

71.     Based on information and belief, the SVO Group Defendants marketed the Embassy Bus by SVO Group as being distinct from other medium-duty cutaway buses because of the materials SVO Group used to fabricate the bus body.

72.     According to an April 10, 2017, article in a trade journal, "Chauffer Driven," Defendant Minix's co-founder and president of SVO Group, Alex Foris, stated that SVO Group had earlier decided to pull weight out of the vehicles in order to increase fuel economy.  The SVO Group Defendants accomplished this by departing from the existing manufacturing methods and materials utilized in the

industry to fabricate bus bodies. Foris was quoted as saying "We said that if we're going to build buses, we're going to do it totally differently."

73.     In order to reduce the bus' weight, the SVO Group Defendants fabricated a one-piece molded roof out of vacuum-formed fiberglass resulting in a room much lighter than existing bus bodies used in the industry at that time.

74.     Plaintiffs allege that the SVO Group Defendants failed to adequately and reasonably research, test, and inspect the ramifications of stripping the bus of necessary weight, and/or that they failed to inspect, research, or test the impact on crashworthiness and stability that their novel manufacturing method and material would have on the handling, stability, and crashworthiness of its vehicles.

75.     As evidenced by the Subject Vehicle's performance in this incident, the strength of its superstructure was insufficient to ensure the residual survival space during the rollover event and to prevent the opening of large portals exposing passengers to the external environment during that event.

76.     Furthermore, as discussed above, the SVO Group Defendants failed to order critical safety-related systems, including enhanced stability control systems, lane departure warning systems, and obstacle detection systems.  This failure is particularly remarkable when considering that the Federal Motor Carrier Safety Administration estimates that based on the reduction of traffic incidents, the payback for lane departure warning type systems was estimated to be as short as nine months and the payback on the investment as high as $6.55 for every dollar spent.

**1.**   **The Design and Placement of the Vehicle's Single Large Luggage Compartment Contributed to Its Fatal Instability**

77.   Another unique design feature of the Subject Vehicle was that it was equipped with one luggage storage compartment positioned at the rear-most portion of the bus, well behind the rear axles and extending from the floor to the roof line of the vehicle, as depicted in the image below.



78.     By contrast, other large buses, including buses designed and manufactured using the Freightliner M2 chassis and cab, such as that pictured below, provide luggage storage compartments positioned below the floor of the passenger compartment and primarily between the front and rear axles, facilitating a more even weight distribution and a lower center of gravity when fully loaded, promoting better stability and handling characteristics.



79.     Plaintiffs allege that the position of the sole large compartment at the rear most section of the vehicle, and extending from the passenger floor level up through the roofline of the vehicle, together with the elevated seating of the main passenger compartment, negatively impacted Subject Vehicle's stability and handling characteristics, making the vehicle more difficult for the driver to control and increasing the risk of severe injury and death for passengers riding on the bus.

**2.      The Design, Materials, and Construction of the Bus Body Rendered It Uncrashworthy**

80.      In their efforts to decrease the bus' weight and increase its fuel economy, the SVO Group Defendants designed, manufactured, and installed a bus body with insufficient structural integrity to maintain survival space within the occupant compartment, and to prevent intrusion of the survival space by any part of the vehicle or by the impact surface during movement of the tilting platform or resulting from impact of the vehicle on the impact surface, and to prevent occupants from being ejected.

81.      The prevention of occupant ejection is a critical aspect of structural design.  In an NHTSA study of 48 motorcoach crashes from 1996-2005, the NHTSA determined that 65% were single vehicle events involving various circumstances such as running off the road, hitting roadside objects, or rolling over, and that passenger ejections were responsible for 56% of the resulting passenger fatalities.

82.      The lack of roof strength, structural integrity, and inadequate window-glazing rendered the Embassy Bus unreasonably dangerous  as evidenced by the massive ejection portals opened along its length as a result of the accident.







83.     The deformation of the roof structure resulted in the passenger ejections previously described and contributed to the number and severity of passenger injuries and deaths.

**D.      The Embassy Bus's Lack of Enhanced Stability Controls, Lane Departure Warning Systems, Stability and Handling, and Crashworthiness Proximately Caused Plaintiffs' Injuries**

84.     The rollover accident involving the Embassy Bus occurred at approximately 11:30 a.m., in clear, sunny, dry conditions when the Subject Vehicle's passenger side tires ran off the road to the right. According to Utah Highway Patrol investigators, the driver steered the Subject Vehicle to the left, back onto the roadway, and then continued left entering the westbound lane. The Subject Vehicle then turned to the right, entered into a clockwise yaw, and rolled onto the driver's side while still on the roadway. Once on its driver side, it slid until it hit a guardrail end section with its roof. Upon impact, it rolled on top of the guardrail and came to rest on its wheels.



85.     As a direct result of the lack of appropriate and available lane departure warning system, the Embassy Bus was involved in a catastrophic rollover accident that was entirely avoidable.  If the Embassy Bus has been equipped with available lane departure warning systems offered by the Daimler Defendants as a for-profit option on the cutaway chassis and cab, the driver would have been alerted by the lane departure warning system that the bus was approaching the right edge of the roadway and would have allowed him to take corrective action before the Embassy Bus left the paved roadway.

86.     As a direct result of the lack of appropriate and available enhanced stability control

systems, the Embassy Bus was involved in a catastrophic, un-tripped, on-road rollover.  If the Embassy Bus had been equipped with available enhanced stability controls, offered by the Daimler Defendants as a for-profit option on the cutaway chassis and cab, the enhanced stability control systems would have automatically engaged to allow the driver to regain control of the vehicle before it was allowed to get into a sufficient yaw for an un-tripped, on-road rollover.

87.     As a direct result of the unreasonably dangerous stability and handling characteristics of the Embassy Bus, the passenger's side tires drifting off of the right edge of the roadway resulted in a loss of control of the vehicle, as well as an un-tripped on-road rollover of the Embassy Bus that should have been avoidable. In this respect, the Daimler Defendants failed to advise or warn the SVO Defendants of the dangers of placing the primary luggage storage compartment far behind the rear axles of the vehicle, extending upward form the passenger floor to the roofline of the vehicle, and the SVO Defendants failed to adequately design, manufacture, and test stability and handling characteristics of the Embassy Bus in a fully loaded condition.

88.     As a direct result of the lack of crashworthiness of the Embassy Bus, including the failure of the roof structure to protect passengers from the external environment together, with the failure of the seatbelt systems to restrain numerous passengers who were wearing their seatbelts at the time of the accident, allowed numerous passengers to be ejected, partially ejected, and/or exposed to the external environment during this one-roll event, resulting in catastrophic injury and death.

89.     The cutaway chassis and cab, and its component parts, were originally designed, manufactured, marketed, assembled, tested, distributed, and sold by the Daimler Defendants.

90.     At the time of the crash, the cutaway chassis and cab, and its component parts were in the same or substantially similar condition as the condition they were in at the time they left the control of the Daimler Defendants and Defendant Truck Centers, Inc.

91.     The bus body and its component parts, were originally designed, manufactured, marketed, assembled, tested, distributed, and sold by the SVO Defendants.

92.     At the time of the crash, the Embassy Bus and its component parts were in the same or substantially similar condition as the time they left the control of the SVO Group Defendants.

93.     At the time of the rollover accident, the Embassy Bus and its components were in an unreasonably dangerous condition, as described herein, and unreasonably dangerous defects were present in the Embassy Bus, including in the cutaway cab and chassis when it was placed into the stream of commerce by the Daimler Defendants and Defendant Truck Centers, Inc., and the bus body when it was placed into the stream of commerce by the SVO Group Defendants.  The Embassy Bus did not undergo any material changes or alterations up to and including the time of the subject collision.

94.     Defendants were aware of the probability of accidents resulting from cutaway bus vehicles drifting off the paved service and/or being exposed to oversteer situations and experiencing excessive yaw in an on-road scenario.  Indeed, that is why the Daimler Defendants partnered with Meritor-WABCO more than a decade before the subject Embassy Bus was built, in order to develop and install systems that would prevent these types of accident from happening and to avoid a catastrophic result when they did occur.

## CAUSES OF ACTION
## COUNT I
## STRICT PRODUCT LIABILITY
### (By All Plaintiffs, Except for Wenhao Qi, Against All Defendants)

95.     Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

96.     The Daimler Defendants, SVO Group Defendants, and Defendant Truck Centers, Inc., designed, manufactured, distributed, and/or sold the subject Embassy Bus with design, manufacturing, and warning defects.

97.     Based on information and belief, Plaintiffs herein allege that Defendants designed, manufactured, researched, tested, assembled, installed, marketed, advertised, distributed, and sold the Model Year 2017 Embassy Bus, bearing Vehicle Identification Number 3ALACWDT7HDJD9595.

98.     At all times relevant hereto, Defendants knew that the subject vehicle would be operated and inhabited by consumers without inspection for defects.

99.     At the time of the collision described above, the subject vehicle was being used in a

manner and fashion that was foreseeable by Defendants, and in a manner in which Defendants intended it to be used.

100.    Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its component parts and constituents, which Defendants intended to be used for the purpose of use as a passenger bus, and other related activities.

101.    The subject vehicle was not reasonably safe as designed because, at the time of its manufacture, the likelihood that the product would cause the Plaintiffs' harm or similar harms, and the seriousness of those harms, outweighed the burden on the manufacturer to design a product that would have prevented those harms and the adverse effect that an alternative design that was practical and feasible would have on the usefulness of the product, but rather, instead exposed the users of said product, and others, to serious injuries because of the failure of Defendants to properly guard and protect the users of the subject vehicle, and others, from the defective design of said product, as set forth above.

102.    Plaintiffs allege that the subject vehicle was defective in that it was unsafe to an extent beyond that which would be contemplated by the ordinary user with knowledge common to the community as to its characteristics.

103.    Furthermore, based on information and belief, Plaintiffs allege the Embassy Bus Defendants manufactured deviates in its construction or quality from the specifications of planned output in a manner that renders the Embassy Bus unreasonably dangerous for the reasons set forth above.

104.    Based on information and belief, Plaintiffs further allege that Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle while failing to warn consumers that there was an unreasonable risk in the intended or reasonably foreseeable us of the Embassy for the reasons set forth herein, of which Defendants knew or should have foreseen.

Defendants failed to adequately warn Plaintiffs of these risks, how to avoid these dangers, or both.

105.    Plaintiffs were not aware of the aforementioned defects.

106.    Plaintiffs would not have used the Embassy Bus if such risks and dangers had been disclosed or known to them.

107.    As a legal and proximate result of the aforementioned defects and Defendants' acts and/or omissions, Plaintiffs suffered severe and permanent injuries and were and will be hindered and prevented from attending to their usual duties and affairs of life and have lost and will lose the value of that time as aforementioned.  Further, Plaintiffs suffered great pain and anguish, both in mind and body, and will, in the future, continue to suffer.  Plaintiffs further expended and became liable for large sums of money and medical care and services endeavoring to become healed and cured of said injuries, for which Defendants are strictly liable.

108.    Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT II

## NEGLIGENCE

### (By All Plaintiffs, Except for Wenhao Qi, Against All Defendants)

109.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

110.    Defendants designed, engineered, developed, manufactured, fabricated, assembled, equipped, tested or failed to test, inspected or failed to inspect, repaired, retrofitted or failed to retrofit, failed to recall, labeled, advertised, promoted, marketed, supplied, distributed, wholesaled, and sold the subject vehicle and its component parts and constituents, which was intended by Defendants to be used for the purpose of use as a passenger bus, and other related activities.

111.    Defendants were negligent in designing, engineering, developing, manufacturing, fabricating, assembling, equipping, testing or failing to test, inspecting or failing to inspect, repairing, retrofitting or failing to retrofit, failing to recall, labeling, advertising, promoting, marketing, supplying, distributing, wholesaling, and selling the Embassy Bus, which was unreasonably dangerous and exposed the users of said product, and others, to serious injuries because of Defendants' failure to properly guard

and protect the Embassy Bus' users, and others, from the defective design of said product, as set forth above.

112.    Defendants had a duty to exercise ordinary care in designing, engineering, developing, manufacturing, fabricating, assembling, equipping, testing or failing to test, inspecting or failing to inspect, repairing, retrofitting or failing to retrofit, failing to recall, labeling, advertising, promoting, marketing, supplying, distributing, wholesaling, and selling the Embassy Bus.

113.    Defendants breached their duty of care by, among other things:

    a.  failure to use due care in the manufacture, distribution, design, sale, and testing of the subject vehicle and its component parts in order to avoid the aforementioned risks to individuals;

    a.  failure to provide adequate warning of the Embassy Bus' lack of a lane departure warning system, enhanced stability controls, adequate and appropriate stability and handling crashworthiness—including lack of an adequately strong roof structure, adequately strong window glazing, and seatbelts to prevent passenger ejection;

    b.  failure to incorporate within the vehicle and its design reasonable safeguards and protections against unintended lane departure and untripped on-road rollover accidents;

    c.  failure to incorporate within the vehicle and its design reasonable safeguards and protections against unintended lane departure and untripped on-road rollover accidents; and

    d.  acts or omissions that were otherwise careless or negligent.

114.    As a legal and proximate result of the aforementioned defects and Defendants' acts and/or omissions, Plaintiffs suffered severe and permanent injuries and were and will be hindered and prevented from attending to their usual duties and affairs of life and have lost and will lose the value of that time as aforementioned.  Further, Plaintiffs suffered great pain and anguish, both in mind and body, and will, in the future, continue to suffer.  Plaintiffs further expended and became liable for large sums of money and medical care and services endeavoring to become healed and cured of said injuries, for which Defendants are strictly liable.

115.    Plaintiffs are, therefore, entitled to damages in an amount to be proven at the time of trial.

## COUNT III

### BREACH OF IMPLIED WARRANTY

#### (By All Plaintiffs, Except for Wenhao Qi, Against All Defendants)

116.    Plaintiffs incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

117.    When Defendants, as the merchant of this vehicle, placed the Embassy Bus in into the stream of commerce, Defendants knew or reasonably should have known of the use for which it was intended and impliedly warranted to Plaintiffs that the use of the Embassy Bus was safe and acceptable.

118.    The subject vehicle was not of merchantable quality and was not safe or fit for its intended use because it was unreasonably dangerous and unfit for the ordinary purpose for which it was used in that it caused injury to Plaintiffs.  Defendants breached their warranty because the Embassy Bus was unduly dangerous for the reasons set forth herein.

119.    As a legal and proximate result of Defendants' breach of the implied warranty of merchantability, Plaintiffs suffered severe and permanent injuries and were and will be hindered and prevented from attending to their usual duties and affairs of life and have lost and will lose the value of that time as aforementioned.  Further, Plaintiffs suffered great pain and anguish, both in mind and body, and will, in the future, continue to suffer.  Plaintiffs further expended and became liable for large sums of money and medical care and services endeavoring to become healed and cured of said injuries, for which Defendants are strictly liable.

120.    Therefore, Plaintiffs are entitled to damages in an amount to be proven at the time of trial.

## COUNT IV

### Wrongful Death—Spouse and Other Beneficiaries

#### (By Plaintiffs Chenduo Qi and Wenhao Qi Against All Defendants)

121.    Plaintiffs Chenduo Qi and Wenhao Qi incorporate by reference each preceding and succeeding paragraph as though fully set forth at length herein.

122.    Plaintiff Chenduo Qi was the husband of Xiuyun Chen, deceased.

123.    Plaintiff Wenhao Qi was the son of Xiuyun Chen, deceased.

124.    As a proximate result of one or more of the aforesaid unreasonably dangerous conditions set forth herein, Plaintiff Chenduo Qi and Wenhao Qi's decedent, Xiuyun Chen, was injured and suffered her death.

125.    Xiuyun Chen is survived by her husband, Chenduo Qi, and her son, Wenhao Qi, and each of them sustained pecuniary loss and loss of society resulting from her death.  Plaintiff Chenduo Qi was also a passenger on the 2017 Embassy Bus when Xiuyun Chen was fatally injured.

126.    As a legal and proximate result of the aforementioned defects and Defendants' acts and/or omissions, Plaintiffs Chenduo Qi and Wenhao Qi suffered injuries resulting from such death, and should recover damages for grief, sorrow, and mental suffering, as the surviving spouse of Xiuyun Chen.

127.    Plaintiffs Chenduo Qi and Wenhao Qi are, therefore, entitled to damages in an amount to be proven at the time of trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

a.      award all actual, general, special, incidental, statutory, and consequential damages to which Plaintiffs are entitled;

b.      award pre-judgment and post-judgment interest on such monetary relief;

c.      grant such further relief that this Court deems appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 15, 2021               By:    /s/ Derek Y. Brandt
                                              Derek Y. Brandt, IL Bar No. 6228895
                                              dyb@mccunewright.com
                                              Emily J. Kirk, IL Bar No. 6275282
                                              ejk@mccunewright.com
                                              Leigh M. Perica, IL Bar No.: 6316756
                                              lmp@mccunewright.com
                                              McCune Wright Arevalo, LLP
                                              231 N. Main Street, Suite 20

Edwardsville, IL 62025
Telephone:  (909) 557-1275
Facsimile:  (909) 557-1275

Richard D. McCune*
rdm@mccunewright.com
David C. Wright*
dcw@mccunewright.com
Kristy M. Arevalo*
kma@mccunewright.com
Steven A. Haskins*
sah@mccunewright.com
Mark I. Richards*
mir@mccunewright.com
McCune Wright Arevalo, LLP
3281 East Guasti Road, Suite 100
Ontario, CA 91761
Telephone:  (909) 557-1275
Facsimile:  (909) 557-1275

Attorneys for Plaintiffs

*Pro Hac Vice Applications to be submitted*